## REYNOLDS v. UNITED STATES.
### No. KC–66.

United States District Court
D. Kansas.
March 13, 1951.

J. Donald Lysaught of Stanley, Stanley, Schroeder, Weeks & Thomas, Kansas City, Kan., for plaintiff.

Lester Luther, U. S. Atty., and Malcolm Miller, Asst. U. S. Atty., both of Topeka, Kan., for defendant.

MELLOTT, Chief Judge.

The issue is whether an aunt of a deceased soldier may be awarded the unpaid balance of the proceeds of two National Service Life Insurance policies. Her right to recover rests upon the statutory provision including within the permissible group of beneficiaries, who may be designated by an insured serviceman, "persons who have stood in loco parentis to * * * [him] at any time prior to entry into active service for a period of not less than one year * * *."[1] The facts have been stipulated and, by this reference, are so found.

Summarizing the facts, the insured, who was born August 6, 1919, lived with his parents until the death of his mother, in 1925, when he and his father moved into the home of his father's parents. The father of the insured became ill in 1926 and had little income thereafter. He died in 1938 after being a complete invalid for approximately one year. Insured's paternal grandfather was also in poor health from 1930 until he died in 1938 and he had no income during that period.

Plaintiff, sister of the father of the insured, was living in her mother's home when insured and his father moved into it in 1925. The insured, his grandmother (Elizabeth Rosier, sometimes hereinafter referred to simply as the grandmother) and plaintiff continued to live in the same home until insured departed to enter military service in 1942. Plaintiff began working

1. Title 38 U.S.C.A. § 801(f), Act of Oct. 8, 1940, c. 757, § 601, 54 Stat. 1008, as amended July 11, 1942, c. 504, § 7, 56 Stat. 659, Aug. 1, 1946, c. 728, § 1(a), 60 Stat. 781.

outside the household in 1926, and from and after 1930 supplied the income of the household with the exception of $27 per month derived by the grandmother from the rental of property. The house in which the family lived was owned by the grandmother. Since 1930 plaintiff paid the household bills, including those for utilities and groceries, and purchased the clothing of her nephew (the insured), paid his school expenses, including text books and fees, and furnished him with spending money.

The grandmother, who was 63 years of age in 1930, had developed a heart condition which became acute in 1938. Thereafter she was incapable, by reason of advanced age and physical condition, of exercising the control and supervision over her grandson which she had formerly exercised. Plaintiff, during the period 1930–1938, assumed more control and supervision over him and, after 1938, "was responsible" for him "to an even greater extent."

"(P)laintiff would testify that during the years * * * [her nephew] was attending school, * * * [she] accompanied him to school activities and events and particularly to those events to which the students' parents were invited. * * * (D)uring this time * * * [he] requested * * * [her] permission to go places and requested such spending money or such money as he needed for special events from her. * * * (D)uring this time * * * [she] entertained * * * [his] friends at the home and sometimes accompanied them to athletic events or places of amusement. * * * (D)uring this time * * * [she] supervised * * * [his] dress and appearance in addition to purchasing all of his clothing."

From 1930 to 1938 insured often came to plaintiff for advice and, after the grandmother's illness became acute in 1938, he turned frequently to plaintiff for counsel and advice in his private affairs. He continued to rely on her for such advice even after his entry into active service; and such requests for advice extended even to the question of the advisability of marriage.

Plaintiff's nephew (the insured) was graduated from high school in 1937. He could not find steady employment and worked only at odd jobs until a few months prior to his entrance into military service in 1942. During this time plaintiff continued to buy clothing for him and to furnish him with spending money. In 1938 she furnished him the money to purchase an automobile. In 1941 she furnished him $500 more when he desired to purchase a later model automobile. The latter sum was requested as a loan and he said he would repay it. After he entered military service he made an allotment out of his pay of $50 a month, "so Aunt Helen can get her money back that way." "(P)laintiff would testify that she never intended this transaction to be a loan, but gave the money as a gift, and * * * deposited these allotment checks in a separate bank account so that a fund would be available to * * * [her nephew] when he was released from the military service."

"(P)laintiff would testify, if permitted to over the objection of defendant, that during the period subsequent to 1930 it was * * * [her] intention to take the place of * * * [her nephew's] mother as best she could and to furnish him with the necessities of life and such luxuries as she was able and to furnish the care, guidance and counsel of a parent."

The nephew—John F. Rosier—entered active service in the army March 30, 1942. On April 1, 1942, he applied for National Service Life Insurance in the sum of $2,-000, designating his grandmother as principal beneficiary without designating a contingent beneficiary. The application was accepted and one of the policies in suit was issued. On July 1, 1943, he applied for additional insurance in the sum of $8,000, designating his aunt, plaintiff, as the principal beneficiary and his grandmother as the contingent beneficiary. The application was accepted and the other policy in suit was issued.

On or about August 27, 1943, the Veterans Administration mailed to the insured a copy of Insurance Form 390, listing the

permissible classes of beneficiaries under the Act of 1940. He noted thereon: "I have lived with my Aunt, Mrs. Reynolds for about seventeen years" and returned it to the Veterans Administration where it was stamped: "Acceptable. Make Part of Original Application" and initialed by agents of the Administration on October 11 and 13, 1943.

Insured was killed in action in the European Theater of Operations August 17, 1944, at which time the premiums on both of the above policies were fully paid and they were in full force and effect. Subsequently the grandmother took steps to secure compensation as a dependent parent of a veteran who died in service. She and plaintiff were both advised that they had been designated as beneficiaries under the policies to which reference has been made, but that neither of them was within the permitted classes of beneficiaries solely by reason of blood relationship and they should execute Form 524 if they felt they could otherwise qualify as beneficiaries. The forms were filled out and returned to the Veterans Administration; but each applicant failed to sign the affidavit.

An additional copy of Form 524, properly filled out and executed, was submitted by the grandmother. Attached to it was an affidavit by plaintiff, stating she had read the answers made by her mother to the questions put to her and that she (the affiant) knew them to be true. The answers particularly important here seem to be those made to questions 5, 6, 8, 9 and 17.

Question No. 5 (Ex. L) seeks to elicit information concerning the "agreement or understanding * * * entered into at the time" deceased was placed in custody by his parents. The answer is: "The mother died in 1925 The father in 1938. Both the father and son made home with me untill (sic) date of Fathers death in 1938. The son John F. Rosier continued in the home untill (sic) entrance into Military Service." Question No. 6 asks for the attending circumstances and the agreement, if any, "if the deceased placed himself" in the custody of the applicant. The answer was: "No agreement—was matter of duty—and nat-

ural that he should be taken into and made a part of my home." In question No. 8, request was made to state the approximate amount expended "toward the support, clothing, and other necessary expenses of the deceased," to which answer was made: "Can not estimate the amount—cared for him and provided for as a son."

Question No. 9 is: "Did any other person contribute toward the support of deceased while he was in your custody? If so, give name of said person or persons, and state what amount was contributed. * * *" It was answered: "Aunt—my daughter— Helen Margaret Reynolds who since 1928 has worked and helped provide and maintain the expenses of the home." Question No. 17 asked for the statement of "any other facts on which" the claim was based, it being answered: "Always reffered (sic) to me as Grandma or Grandmother."

By letter dated November 22, 1944, plaintiff was advised by the Veterans Administration that her claim had been disapproved and an administrative determination had been made that her mother, grandmother of insured, "stood * * * [in the relationship of loco parentis to the serviceman] and that she must be recognized as beneficiary of all the National Service Life Insurance amounting to $10,000 * * *." Plaintiff's claim was accordingly disapproved. Plaintiff did not appeal from the administrative determination, but on November 30, 1944, wrote a letter to the Administration expressing satisfaction with the decision reached.

By letter of January 8, 1945, the Veterans Administration informed plaintiff she would not be entitled to any unpaid balance of the insurance proceeds in the event her mother died "prior to the payment of 120 monthly installments certain." In a letter of January 15, 1945, written in behalf of plaintiff, it was stated, *inter alia*: "* * * Mrs. Reynolds feels your decision in recognizing her mother as the person standing in position of loco parentis is a fair one, since her mother reared this boy from the time he was five years of age, however, it is true that for the next sixteen years Mrs. Reynolds has contributed to the support of

the deceased, and we think the fact that he named both his grandmother and his aunt as beneficiaries in his * * * policies, shows that it was his desire both of these persons benefit by any insurance that might be payable in the event of his death while he was in the service of his country, and should either his grandmother or his aunt predecease the other, that the one living should receive the benefits. At the time he took out these policies he told his grandmother and aunt he had been advised by his Commanding Officer to have the policies written up in this manner, so that both of them would stand in line for any benefits that might be paid."

Payments were made to the grandmother until her death on March 23, 1948. Under the $2,000 policy they aggregate $816.64 and under the $8,000 policy, $3,266.56. Plaintiff and her mother continued to live together and their relationship was friendly. The insurance proceeds were used for their "mutual benefit" and plaintiff did not again assert her claim to a portion of the insurance proceeds until after her mother's death. Subsequently she filed a claim for the balance of the proceeds, which was denied. An appeal was taken and the Board of Veterans Appeals held that the "evidence fails to establish that the appellant stood in loco parentis toward the insured for a period of one year or more during his minority as required by law." Thereafter the instant suit was filed. This court has jurisdiction.[2]

▇▇ Leyerly v. United States,[3] cited by both parties, is apposite and holds that since the statute does not define the term loco parentis, the "common law concept * * * controls." The term implies "a standing in the place of * * * a parent; one charged fictitiously with a parent's rights, duties and responsibilities." "The assumption of the relationship is primarily a question of intention, to be shown by the acts, conduct and declaration of the person alleging to stand in that relationship."

From the welter of cases decided by the courts, many of which are cited by counsel in well-prepared briefs, several subsidiary principles evolve, some of which are summed up in defendant's brief in this language: "One must show first an intention to undertake the duties of a parent; second, the actual fulfillment of the duties of a parent, including support and provision for the child; and, third, that the one supported is a minor or a person in need of parental support."

Defendant contends plaintiff has failed to make the required showing. Reliance is also placed by counsel for defendant upon the holding in Mansfield v. Hester, D.C.S.D. W.Va.1949, 81 F.Supp. 772 (possibly only dictum) that two women could not, at the same time, sustain the relationship of loco parentis toward one child and also upon an administrative ruling[4] to somewhat the same effect. In the latter it is "Held: Only one individual can occupy the status of a father, and only one individual can occupy the status of a mother, in loco parentis at the same time * * *." The suggestion by counsel for plaintiff that the aunt, under the admitted facts in this case, when she "went out into the world of commerce in order to earn the income necessary for the support of the household and the insured, * * * assumed the duty and obligation of a father to the insured" is characterized by counsel for the government as "specious." So much, then, for a partial outline of the controversy.

▇▇ The administrative determination, of course, is not binding upon this court, although it is entitled to weight and should not be overturned unless clearly wrong.[5]

2. Title 38 U.S.C.A. § 817, Act Oct. 8, 1940, c. 757, § 617, 54 Stat. 1014, as amended July 11, 1942, c. 504, § 6, 56 Stat. 659, Aug. 1, 1946, c. 728, § 14, 60 Stat. 788; 28 U.S.C.A. § 1346, Act of June 25, 1948, c. 646, 62 Stat. 933, as amended April 25, 1949, c. 92, § 2(a), 63 Stat. 62; May 24, 1949, c. 139, § 80(a, b), 63 Stat. 101.

3. 10 Cir., 1947, 162 F.2d 79, 85.

4. Administrative Decision, Veterans Administration, No. 792, August 30, 1948, copy of which is attached to defendant's brief.

5. U. S. v. Citizens Loan & Trust Co., 1942, 316 U.S. 209, 62 S.Ct. 1026, 86 L.Ed. 1387.

It is doubtful if the ruling to which reference has been made is in that category; but, if so, it does not require decision against plaintiff. Indeed, the examples given in the ruling tend to support her claim. Thus, it is pointed out, an insured might properly "designate two aunts * * * who at different times stood *in loco parentis* to him," one being designated as principal beneficiary and the other as contingent beneficiary. "The Insurance Service found these were valid designations [and] the office of the Solicitor concurred in that finding * * *." True, the statement was made elsewhere in the ruling that the word "parents," as used in the act, "refers to one man and one woman who are the father and the mother of the insured, or to one man and one woman who occupy that relationship." At first blush that seems to be sound—at least, it is expressive of the normal situation. But the act recognizes as parents "persons (plural) who have stood in loco parentis * * * for a period of not less than one year;" and, in this court's studied judgment, the argument of plaintiff is not entirely "specious." There is nothing in the act requiring that two persons standing in loco parentis be of different sexes; and where a woman becomes the breadwinner of a household, evidencing "an intention to undertake the duties" of a father to the minor occupants of the home, fulfills the duty of such parent, "including support and provision for the child," who "is a minor or a person in need of parental support," [6] she well may be "in loco parentis"—charged, fictitiously, with the father's rights, duties and responsibilities.

■ But if the court has erred in going to the length set out above, still the plaintiff should prevail. The stipulated facts (supplemented by what, it is agreed, would be the testimony) show that at least beginning in 1938 and continuing until the minor attained his majority, the aunt became, in truth and in fact, the one standing *in loco matris*. The grandmother, "by reason of her advanced age and physical condition, [in 1938, became incapable] of exercising the control and supervision over the deceased formerly exercised by her." [7] The aunt took over, as is indicated by the affidavits of neighbors, her testimony (if given) and her mother's statements. Thus it is shown in one of the documents filed by the grandmother with the Administration (Ex. I) that plaintiff "manages the home and works and looks after my maintenance and provides for my welfare." This statement was made after the serviceman's death; but it indicates the daughter had progressively become the dominant member of the household. More significant, however, is the conduct of the serviceman. Thus he not only sought his aunt's advice upon matters pertaining to his personal welfare—matrimony —but, when sent a form letter by the Administration, immediately after taking out the policy in which his aunt was designated principal beneficiary, (Ex. H), indorsed thereon "I have lived with * * * [her] for about seventeen years." This was found by the Administration to be "acceptable." Although such finding is not binding, the court is constrained to believe the whole chain of circumstances is such as to justify it in holding that the plaintiff stood *in loco parentis* to the serviceman for more than one year while he was a minor and before he entered the military service.

Nor does the court feel a different conclusion is dictated because plaintiff acquiesced in, and approved, the payment of a number of the monthly installments to her mother. [8] Manifestly, she may not recover the payments so made and she does not seek to do so. She is, however, in this court's opinion, entitled to the remainder due. Appropriate decree so providing should therefore be prepared. Settle in accordance with the Federal Rules of Civil Procedure, 28 U.S.C.A. and the local Rules of Practice.

6. The quotations are from defendant's brief set out earlier in this opinion.

7. Paragraph 8 of Stipulation.

8. Cf. McClendon v. United States, 7 Cir., 1947, 163 F.2d 895.